UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

JAN M. GASKILL,                                  Case No. GG 11-01322
                                                 Chapter 13
        Debtor.
_____/

FIRST AMERICAN TITLE INSURANCE
COMPANY,

        Plaintiff,                               Adv. Proc. No. 11-80230

v.

JAN M. GASKILL,

        Defendant.
_____/

**OPINION REGARDING NONDISCHARGEABLE DEBT
ADVERSARY PROCEEDING**

Appearances:

William H. Franks, Esq., and Kelli L. Baker, Esq., Grand Rapids, Michigan, attorneys for
        First American Title Insurance Company, Plaintiff.

Roger G. Cotner, Esq., Grand Haven, Michigan, attorney for Jan M. Gaskill, Debtor-
        Defendant.

I. INTRODUCTION.

        This adversary proceeding involves losses sustained by the Plaintiff, First American

Title Insurance Company ("First American") when Advantage Title and Escrow Agency, Inc.

("Advantage Title") failed to remit premium payments owed to it under an insurance agency

agreement. At the time the losses were sustained, Jan M. Gaskill (the "Debtor") was Vice

President and Treasurer of Advantage Title.  First American asserts that the Debtor's failure to remit premiums constituted "defalcation while acting in a fiduciary capacity" and that the resulting debt should be nondischargeable under § 523(a)(4) of the Bankruptcy Code.[1]

## II.  JURISDICTION.

This court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The case and all related proceedings have been referred to this court for decision.  28 U.S.C. § 157(a); Local Rule 83.2(a) (W.D. Mich.).  This adversary proceeding is a statutory core proceeding. 28 U.S.C. § 157(b)(2)(I) (determinations regarding dischargeability of a debt). Notwithstanding the holding in Stern v. Marshall, __ U.S. __, 131 S. Ct. 2594, 180 L.Ed.2d 475 (2011), this court is constitutionally authorized to enter a final order.  See Tibble v. Wells Fargo Bank, N.A. (In re Hudson), 455 B.R. 648, 656 (Bankr. W.D. Mich. 2011) (the Stern decision is extremely narrow; "[e]xcept for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings").  This opinion constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## III.  FACTS.

In March 2002, Sandy Peck ("Peck") established Advantage Title.  When the corporation was formed, Peck was the sole shareholder.  Not long after Advantage was formed, Peck asked the Debtor to join her in this new business venture.  Peck and the

---

[1] The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§__."

Debtor had previously worked together at another title insurance agency, and had been close friends for over twenty years. The Debtor had also been an insurance agent licensed by the State of Michigan since August 10, 1994. She accepted Peck's invitation and was appointed as Vice President and Treasurer of the corporation on March 21, 2002. On April 15, 2002, Advantage Title opened for business. Approximately one year later, in April 2003, the Debtor received a fifty percent ownership interest in Advantage Title and continued to hold the positions of Vice President and Treasurer. (Tr. at 71-72.) On a day-to-day basis, the Debtor handled closings for Advantage Title.

Just prior to the official opening of Advantage Title, First American and Advantage Title entered into a written Policy Issuing Agency Contract ("Agency Agreement") dated March 18, 2002. (Plaintiff's Ex. 1.) Under the Agency Agreement, Advantage Title was authorized to act as First American's agent by issuing title insurance commitments and policies in First American's name. The Agency Agreement provided that any such insurance policy or commitment must be "signed, personally, by such designated signatories of [Advantage Title], who have been authorized by [Advantage Title] and approved in writing by [First American]." (Id. at ¶ 2(b).) The *only* signatory identified in the Agency Agreement as "presently approved" by First American was Peck. The Agency Agreement was amended on several occasions. None of these amendments identified additional approved signatories. (Id.; Tr. at 48-49.) Notwithstanding the multiple amendments, the Debtor was never listed as an approved signatory who was an authorized agent of First American.

The Agency Agreement also required Advantage Title to provide monthly reports to First American of all policies issued and to maintain a segregated account to hold

3

premiums due to First American.[2] (Plaintiff's Ex. 1 at ¶ 5, 6.) First American was to receive twenty-percent of the premiums collected with Advantage Title retaining eighty-percent. (Tr. at 77). Pursuant to the Agency Agreement, First American was authorized to audit the books and records of Advantage Title.

At the time the Agency Agreement was executed, Peck was the sole shareholder of Advantage Title. Peck, in her capacity as President, negotiated and signed the Agency Agreement, and all subsequent amendments, on behalf of Advantage Title. (Planitiff's Ex. 1, Tr. at 33.) Peck remained First American's main contact at Advantage Title throughout their agency relationship. In fact, aside from quarterly lunch meetings, which Gaskill sometimes attended, First American dealt exclusively with Peck. (Tr. at 35-36.)

Advantage Title had a number of escrow accounts at different times during its history, but it eventually maintained only an operating account. (Tr. at 75.) The Debtor had authority to write checks from all of the accounts held by Advantage Title. However, in practice, Peck had the sole responsibility for maintaining the operating account, paying the corporation's bills and remitting First American's portion of the premiums collected.[3] Additionally, Peck alone communicated with Advantage Title's accountant to prepare all necessary tax returns and financial statements. (Tr. at 75-76.) The Debtor did not receive

---

[2] Although the agreement required monthly reporting, the Debtor explained that reports were not provided to First American on a regular basis. (Tr. at 94.) Similarly, James Casson, a Vice President of First American, testified that, in practice, the segregation of premiums required under the agreements was rarely complied with by agents. (Tr. at 51.)

[3] Routinely, the premiums that were remitted to First American were paid out of Advantage Title's general operating account. (Tr. at 52.) First American never objected to this practice as violating the Agency Agreement. (Id.)

4

or review the corporation's mail or pay its bills. Nor did the Debtor review the tax returns, the quarterly or annual financial statements of the company, or the bank account statements. (Tr. at 86.)

While Peck handled the operating side of the business, the Debtor was responsible for handling the agency's closings. When disbursements were made at closings, one check was issued payable to Advantage Title for the full premium amount, as well as for the closing costs. (Tr. at 79, 137.) The Debtor then provided the check to Peck who, the Debtor reasonably believed, deposited the funds into the operating account of Advantage Title. (Tr. at 79.) The Debtor generated monthly or bi-monthly reports listing policies issued and the total premiums collected. (Tr. at 79-80; 94.) The reports also specified the amount to be remitted to First American and the amount to be retained by Advantage Title. (Id.) She then provided these reports to Peck who was responsible for forwarding the reports to First American, together with a check for its portion of the premium. (Tr. at 95; 107-08.)

Advantage Title held an operating line of credit with Union Bank for some period of time. In 2008, the bank (or its successor)[4] advised Advantage Title that collateral would be necessary to continue the line of credit. (Tr. at 119.) Due to her ongoing divorce proceedings, Peck was only able to offer "a couple vehicles" as collateral; to supply collateral, the Debtor mortgaged her home. (Tr. at 120.) As a result, Peck and the Debtor, upon the advice of their corporate counsel, entered into an agreement on November 19,

---

[4] Although not explicitly in the record, Union Bank merged with another bank before 2008 and its name was changed. Because the bank was referred to as "Union Bank" during the trial, the court will do likewise in this opinion.

5

2008, regarding the "considerable debt" incurred by Advantage Title, including but not limited to the operating line of credit at Union Bank. The agreement provided in part that "[i]n the event [Advantage Title] is unable to meet its obligation, and any creditor demands payment from the Shareholders, or either of them, the Shareholders agree that each Shareholder shall be responsible for and shall pay 50% of any amount demanded by any creditor." (Plaintiff's Ex. 6.) Although this document creates a contractual obligation between Peck and the Debtor if one of them becomes personally liable or pays on a corporate debt, it does not represent a personal guarantee of Advantage Title's debts to creditors. After reading the exhibit, the court finds it creates a contribution or indemnification relationship between Peck and the Debtor.

Some time in 2008, the close friendship between the Debtor and Peck began to deteriorate. (Tr. at 82.) On June 9, 2009, Peck abruptly advised the Debtor that she was moving to Texas. (Tr. at 81-82.) Peck left just days later. (Tr. at 81.)

After Peck's departure, things began "crashing in" at Advantage Title. (Tr. at 114.) The Debtor began receiving and reviewing the mail. Each day, the Debtor received notices that various corporate bills had not been paid, including premiums for their Errors and Omissions insurance, several years of property taxes, and state taxes. (Tr. at 83.) The Debtor also began working with a new accountant for the corporation to gather information for preparation of 2008 tax returns. In doing so, she discovered that much of the corporation's financial documentation was missing. (Tr. at 109-110.) At first, these developments were surprising to the Debtor. Prior to Peck's sudden departure, the Debtor believed that Advantage Title's financial situation was "tight." (Tr. at 86.) Even so, the Debtor had a "rough" idea of Advantage Title's general operating expenses, and she

6

believed that the funds being generated by Advantage Title were sufficient to cover these expenses. (Tr. at 115.)

Then the reason for the hidden financial deficiencies became clear: the Debtor discovered credit card statements which revealed that Peck – her former close friend and now missing business co-owner – had been using corporate credit cards to make undisclosed personal purchases over the course of several years. (Tr. at 112-13.) According to the Debtor's estimate, these purchases totaled approximately $250,000. (Id.) Because the Debtor also discovered a number of the reports she generated following closings in Peck's desk, she advised her contact at First American that Peck had left and that she suspected First American may not have received all premiums owed. (Tr. at 83-84; 114-15.) First American then audited the books and records of Advantage Title with the Debtor's assistance. (Tr. at 93-95.) The audit revealed significant shortfalls in the accounts where the premiums owed by Advantage Title to First American were maintained. It was ultimately determined that Advantage Title had failed to remit $99.902.85 in premiums which should have been paid to First American under the Agency Agreement.[5]

The court finds it very curious that First American failed to recognize that it had not received approximately $100,000 in premiums for policies it had underwritten. Although the Agency Agreement requires Advantage Title to provide First American with monthly reports of all policies issued, First American either did not receive information from

_____

[5] At the beginning of trial, the parties stipulated that $99,902.85 was the amount of unpaid premiums at issue in this adversary proceeding. (Tr. at 18.) This amount represents the twenty-percent "that was supposed to have been remitted to First American" under the Agency Agreement for policies that Advantage Title wrote and First American underwrote. (Id.)

7

Advantage Title regarding the issuance of new policies, or failed to review such information to the extent it was received.  There is absolutely no evidence, however, that First American ever inquired with anyone at Advantage about the lack of premium payments. It is certain that no such inquiries were ever made to the Debtor.  Instead, somewhat ironically, it was the *Debtor* who first alerted *First American* about unfiled reports and unpaid premiums.  The Debtor fully cooperated and assisted First American in its audit to determine the unpaid amounts that were owing to it.

On November 5, 2009, First American filed a complaint in the Barry County Circuit Court, State of Michigan, against Advantage Title, the Debtor, and Peck for breach of the Agency Agreement, defalcation and breach of fiduciary duty, and conversion.  On December 1, 2010, the Barry County Circuit Court granted First American's motion for summary disposition against Advantage Title and entered a money judgment against Advantage Title in the amount of $319,040.20 for conversion of the premiums, fraud/defalcation under Mich. Comp. Laws Ann. § 500.1207, and breach of contract in the amount of $101,102.85.  In the same order, the state court denied First American's motion for summary judgment against the Debtor.

On March 10, 2010, Peck[6] filed a petition for relief under chapter 7 in the United States Bankruptcy Court for the Eastern District of Michigan.  On June 6, 2010, First American filed an adversary complaint seeking a nondischargeable judgment against Peck in the amount of $303,514.32 (the unpaid premiums multiplied by three) resulting from Peck's conversion of the premiums, plus costs and reasonable attorney fees. On October

---

[6] By the time of her bankruptcy filing, Peck had changed her name to Sandra Falk.

8

29, 2010, the bankruptcy court in the eastern district entered a default judgment against Peck in the amount $304,772.32.

On February 13, 2011, the Debtor filed her petition for relief under chapter 13 of the Bankruptcy Code in this court. On May 13, 2011, First American filed this adversary complaint seeking a judgment for nondischargeable debt against the Debtor under § 523(a)(4) and § 523(a)(6) in the amount of $303,514.32 (the premiums multiplied by three) resulting from the Debtor's alleged failure to remit the premiums, plus costs and reasonable attorney fees.[7]

On July 10, 2012, this court held a trial. During the trial, three witnesses testified: the Debtor; James Casson, Vice President of First American; and Belinda Falconer, a former employee of Advantage Title. All witnesses testified credibly. The Debtor gave particularly credible testimony regarding her duties and responsibilities at Advantage Title, her lack of knowledge that Peck was not making the requisite payments to First American, her shock at discovering Peck's misuse of corporate funds, and her lack of any specific knowledge of the corporation's true financial situation. The Debtor's testimony was adequately corroborated by Falconer's explanations of the division of duties and responsibilities at Advantage Title and the corporation's internal procedures. After the close of proofs, the court took the adversary proceeding under advisement.

---

[7] Although First American's complaint in this adversary proceeding contained counts alleging embezzlement under § 523(a)(4) and conversion under § 523(a)(6), First American informed the court, in its preliminary statement on the record at trial, that it was not pursuing those causes of action. (AP Dkt. No. 1, Tr. at 16-17.) The sole remaining issue in this adversary proceeding is whether the Debtor committed defalcation while acting in a fiduciary capacity under § 523(a)(4).

9

## IV. <u>ISSUE.</u>

The issue presented is whether the Debtor committed "defalcation while acting in a fiduciary capacity" such that the debt owed to First American for unpaid premiums is nondischargeable under § 523(a)(4).

## V. <u>DISCUSSION.</u>

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." First American alleges that the Debtor committed defalcation while acting in a fiduciary capacity by failing to remit the premium payments to First American as required by the Agency Agreement.

"A debt is non-dischargeable as the result of defalcation when a preponderance of the evidence establishes: (1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." <u>Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)</u>, 565 F.3d 963, 968 (6th Cir. 2009) (citing <u>Board of Trustees of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)</u>, 493 F.3d 635, 639 (6th Cir. 2007)). Because there is no dispute that the unpaid premiums represent a "loss" to First American, the critical issues in this adversary proceeding are whether the Debtor owed a fidiciary duty to First American and, if so, whether she breached that duty through "defalcation."

A. <u>*Did the Debtor Owe First American a Fiduciary Duty?*</u>

The term "fiduciary capacity" is construed more narrowly under § 523(a)(4) than in some other contexts and applies only to express or technical trust relationships that result from specific property being placed in the hands of the debtor. <u>R.E. America, Inc. v. Garver (In re Garver)</u>, 116 F.3d 176, 179 (6th Cir. 1997). Although the existence of a

fiduciary relationship under § 523(a)(4) is governed by federal law, courts look to state law to determine whether an express or technical trust has been created. Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 390-91 (6th Cir. 2005); Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.), 760 F.2d 121, 124 (6th Cir. 1985) ("the nature of the property interest in question" is determined under state law).

It is not difficult to conclude, and the Debtor does not dispute,[8] that a fiduciary relationship existed between Advantage Title and First American under Michigan law. In Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.), 760 F.2d 121 (6th Cir. 1995), the Sixth Circuit Court of Appeals addressed facts resembling those in this adversary proceeding: pursuant to an agency agreement, the corporate debtor, Interstate, had authority to accept premiums for insurance policies underwritten by Capitol Indemnity Corporation ("Capitol"). Interstate failed to remit the premiums to Capitol as required by the agreement. After both Interstate and its president and majority shareholder, Arthur Lilly, filed for bankruptcy protection, Capitol sought to have the resulting debt excepted from discharge under § 523(a)(4).

The Sixth Circuit held that the Michigan Insurance Code "clearly establishes an insurance agency relationship as an express trust fiduciary relationship." In re Interstate Agency, Inc., 760 F.2d at 124. The relevant statutory provision states:

> An agent shall be a fiduciary for all money received or held by the agent in his or her capacity as an agent. Failure by an agent in a timely manner to

---

[8] See Debtor's Answer ¶ 23, AP Dkt. No. 7 ("Ms. Gaskill admits that a fiduciary relationship existed between Advantage Title and Plaintiff" but "denies that a fiduciary relationship existed between herself as an individual and Plaintiff.")

11

turn over the money which he or she holds in a fiduciary capacity to the persons to whom they are owed is prima facie evidence of violation of the agent's fiduciary responsibility.

Mich. Comp. Laws Ann. § 500.1207(1).[9] In Interstate, the Sixth Circuit noted that Michigan courts construing this statute have consistently "held that premium payments received by an insurance agency have the status of trust funds for the benefit of the insurance principal." In re Interstate Agency, Inc., 760 F.2d at 124 (citing Citizens Mutual Automobile Insurance Co. v. Gardner, 315 Mich. 689, 24 N.W.2d 410 (1946); Travelers Insurance Co. v. Bishop, 298 Mich. 600, 299 N.W.731 (1941); Glerum v. Spencer, 251 Mich. 163, 231 N.W. 38 (1930)).

In Interstate, the Sixth Circuit further concluded that the individual debtor, Lilly, as president and majority shareholder of the insurance agency, also owed a fiduciary duty to Capitol. Under general corporate law, a corporation is a distinct legal entity and, unless the corporate veil is pierced, officers, directors and shareholders are shielded from personal liability for the debts or actions of the corporation. See Kline v. Kline, 104 Mich. App. 700, 702, 305 N.W.2d 297, 298 (1981) (Michigan law "treats a corporation as an entirely separate entity from its stockholders") (citing Bourne v. Sanford, 327 Mich. 175, 191, 41 N.W.2d 515, 522 (1950)); see also Cash America Fin. Servs., Inc. v. Fox (In re Fox), 370 B.R. 104, 113 (Bankr. 6th Cir. 2007) (under Ohio law, corporate officer is not personally liable for the debts of the corporation, absent piercing of the corporate veil). An exception to this general rule applies, however, when officers or directors "personally cause their corporation to act unlawfully." Livonia Bldg. Materials Co. v. Harrison Constr. Co., 276

---

[9] Since Interstate was decided, the statute has been amended to make minor grammatical changes. The court has cited the current statutory language.

12

Mich. App. 514, 519, 742 N.W.2d 140, 143-44 (2007) (citing People v. Brown, 239 Mich. App. 735, 739-40, 610 N.W.2d 234 (2000)).  Thus, the court in Interstate explained that under "well established" Michigan law, "a corporate officer or agent is personally liable for torts committed by him *even though he was acting for the benefit of the corporation.*"[10]  In re Interstate, 760 F.2d at 125 (quoting A&M Records, Inc. v. M.V.C. Distributing Corp., 574 F.2d 312 (6th Cir. 1978)) (emphasis in original).

The Sixth Circuit relied on these principles to conclude that Lilly had breached his fiduciary duty to Capitol and was personally liable for the resulting debt.  However, the facts in Interstate are much different from the facts in this adversary proceeding in several notable ways.

In Interstate, Lilly, a licensed insurance agent, had signed the agency agreement on behalf of the corporation.  Lilly had also personally guaranteed the agency agreement, and several subsequent agreements for repayment of the premiums owed to Capitol.  The court explained that these facts, in addition to his role as president and large shareholder of Interstate, provided "overwhelming evidence" of Lilly's "full knowledge and responsibility for the handling of Interstate's trust undertakings."  In re Interstate Agency, Inc., 760 F.2d at 125.  Based on this evidence, the Sixth Circuit suggested that Lilly could be "imputed"

---

[10] The Michigan Supreme Court recently re-affirmed this well-settled principle. Dept. of Agriculture v. Appletree Marketing, LLC, 485 Mich. 1, 17, 779 N.W.2d 237, 246 (2010) (corporate officers "may be held personally liable for their individual tortious acts done in the course of business, regardless of whether they were acting for their personal benefit or the corporation's benefit.").  The court explained that imposition of personal liability in such instances does not require piercing of the corporate veil, but rather derives from the concept that a corporate officers may not escape liability for "*their own* tortious misconduct" by "hid[ing] behind the corporate form." Appletree Marketing, Inc., 485 Mich. at 18-19, 779 N.W.2d at 247 (emphasis in original).

13

with "participation in Interstate's breach of fiduciary duty to Capitol." Id. More importantly, the court held that Lilly was "personally acting in a fiduciary capacity" and that he had "breached his fiduciary duty stemming from these separate obligations: 1) his status as president of Interstate; 2) his personal status as an insurance agent under the Michigan Code; and 3) his personal signing of the agency agreements." Id. Because Lilly was also "personally responsible for the defalcation of the funds" held in trust for Capitol, the Sixth Circuit reversed the district court's conclusion that Lilly was not personally liable for Interstate's corporate debt and held that the debt to Capitol was not dischargeable in Lilly's personal bankruptcy case.

It is easy to discern that Lilly's culpability in directing and controlling his corporation's misappropriation of the premiums was critical to the Sixth Circuit's holding in Interstate. This result makes sense. Corporate officers are personally liable for their own tortious acts and should not be permitted to hide behind the corporate form to escape liability for their actions. In re Interstate, 760 F.2d at 125; Appletree Marketing, LLC, 485 Mich. at 17-19, 779 N.W.2d at 246-47. The Sixth Circuit has explained:

> If the fiduciary relationship is not imposed upon the *corporate officer charged with maintaining the fiduciary relationship*, then § 523(a)(4) could be rendered meaningless in cases where the fiduciary relationship is established between a creditor and a corporate fiduciary only. All a debtor would have to do to avoid § 523(a)(4) is place the corporation in the position as fiduciary rather than himself. He could then breach the fiduciary relationship with impunity.

Lagere & Walkingstick Ins. Agency, Inc. v. Huff (In re Huff), 124 F.3d 197, *3 (6th Cir. Sept. 5, 1997) (unpublished table opinion) (quoting Sun Life Ins. Co. of America v. Koszuth (In re Koszuth), 43 B.R. 104, 108 (Bankr. M.D. Fla. 1984) (emphasis added)). Indeed, the vast majority of cases that have relied on Interstate to impose liability on a corporate officer

14

under § 523(a)(4) involve individuals who controlled their corporations and personally caused or directed the breaches of fiduciary duty that led to the losses at issue. See, e.g., Woodworking Enters., Inc. v. Baird (In re Baird), 114 B.R. 198, 204-05 (Bankr. 9th Cir. 1990) (president and sole shareholder of corporation was personally liable for breaches of Arizona builder's trust fund statute because he was "the only person responsible for disbursing funds held by [his corporation]" and therefore "directly and actively participated in the defalcation" of those funds); Baker v. Wentland (In re Wentland), 410 B.R. 585, 599 (Bankr. N.D. Ohio 2009) (defendant, who was  president of corporation and controlled corporation's finances, was personally liable for failure to apply funds withheld from employee's wages to payments of health insurance premiums); Nuchief Sales, Inc. v. Harper (In re Harper), 150 B.R. 416, 419 (Bankr. E.D. Tenn. 1993) (corporate stockholder, officer, director, bookkeeper and day-to-day operational supervisor was personally liable for corporation's breaches of fiduciary duty under the Perishable Agricultural Commodities Act; the "focus of fiduciary liability is *upon the actor responsible for the act* rather than the corporate form;" with regard to corporate fiduciary obligations, "it is the *employee or officer responsible for implementing the fiduciary responsibilities* who is liable for any acts of defalcation") (emphasis added).

This reasoning does not apply with equal force when a debtor is not the corporate control person who actually causes or participates in the corporation's breach of its fiduciary duties. See, e.g., Porter Capital Corp. v. Campbell (In re Campbell), 2008 WL 4682785, at *8 (Bankr. E.D. Tenn. Oct. 21, 2008) (unpublished opinion) (declining to impose personal liability under § 523(a)(4) and Interstate when there was no evidence corporate officer "directed or participated in the alleged misappropriation" and "played no

role in the financial management" of the corporation).   In stark contrast to the facts in Interstate, the Debtor in this case had a very limited relationship with First American. The Debtor was not a signatory to the Agency Agreement.  She did not personally guarantee Advantage's debt to First American.   More importantly, it is undisputed that *the Debtor played no role whatsoever in the failure to properly remit premiums to First American.* The Debtor handled closings, received the premium payments, and turned those payments over to Peck.  The Debtor then prepared reports of the premiums received and the amounts owed to First American under the Agency Agreement.  She turned those reports over to Peck with the understanding that Peck would remit the premiums to First American. It was Peck who was responsible for paying First American and Peck who failed to meet this obligation.

Also, from First American's point of view, it dealt solely with Peck.  It did not add the Debtor as a signatory when the Agency Agreement was amended on multiple occasions, it made no inquiries to the Debtor until Peck "skipped town," and it was unable to show that the Debtor was involved in any material financial relationship with it.  Further, First American's loss was attributable, in great part, to its failure to review reports and remittances submitted by *Peck*, not the Debtor.

Regardless of the important factual distinctions between the two cases, First American attempts to rely on the Sixth Circuit's holding in Interstate to support its assertion that the Debtor owed it a fiduciary duty based on the her status as a corporate officer, specifically Vice President and Treasurer, of Advantage Title, and as a insurance agent under Michigan law. First American then alleges that the Debtor breached these duties by "sticking her head in the sand" – that is, by failing to apprise herself of Advantage Title's

16

true financial situation and by neglecting to monitor whether premium payments were being made to First American as required by the Agency Agreement.    The court rejects the assertion that these grounds support imposition of personal liability under the facts of this case.

Specifically, the court holds that the grounds relied upon by First American are not sufficient, by themselves, to establish that the Debtor owed First American a fiduciary duty. First, although Michigan law imposes fiduciary duties on corporate officers and directors, see Mich. Comp. Laws Ann. § 450.1541a, it does not provide that corporate assets are held in trust by corporate officers or that corporate officers act as trustees with regard to the assets of the corporation. Michigan Web Press, Inc. v. Wilcox (In re Wilcox), 310 B.R. 689, 696-97 (Bankr. E.D. Mich. 2004); Digital Commerce, Ltd. v. Sullivan (In re Sullivan), 305 B.R. 809, 825 (Bankr. W.D. Mich. 2004). In the absence of the culpability and control such as exhibited by the individual debtor in Interstate, the court finds that the Debtor did not owe First American a fiduciary duty based solely on her status as an officer of Advantage Title.

Second, First American is correct that the Michigan Insurance Code provides that licensed insurance agents are fiduciaries "for all money received or held by the agent." Mich. Comp. Laws Ann. § 500.1207(1). The few cases interpreting this provision have applied this fiduciary status to both corporate entities and the individual agents who control them.    See, e.g., In re Interstate, 760 F.2d at 125; IBF Ins. Group, Inc. v. Traveler's Indemnity Co., 2005 WL 3190513 (Mich. App. Nov. 29, 2005) (unreported opinion) (individual who was president, majority shareholder, and sole employee of insurance agency owed insurance company a fiduciary duty based on his "personal status as an

17

insurance agent under the Michigan Insurance Code"); see also In re Huff, 124 F.3d 197 at *3 (under similar Kentucky statute, individual insurance agent who was president of insurance agency and personal signatory to producer agreement, owed fiduciary duty to insurance company for unpaid premiums). Without exception, these cases all involved individuals who controlled their corporate entities, were signatories to the agency agreements with the insurance companies, and were personally responsible for the failure to remit premiums under the agreements. Here, Advantage Title is the agent designated under the Agency Agreement with First American. The Debtor did not sign the Agency Agreement on behalf of Advantage Title and is not designated as an approved signatory under the agreement. In accordance with the reasonable division of labor at Advantage Title, the Debtor accepted the premium payments at closing, but immediately turned them over to Peck for deposit in Advantage Title's operating account. Under the specific facts of this case, the court holds that the Debtor was not a fiduciary with respect to the premium funds.[11]

B.   *Did the Debtor Breach Her Fiduciary Duty by Defalcation?*

Even assuming the Debtor owed First American a fiduciary duty under Michigan law, the Debtor's complete lack of control over or culpability for the failure to remit the premium funds to First American precludes a finding that the Debtor breached her duties by defalcation. For purposes of § 523(a)(4), the term "defalcation" is defined under federal

---

[11] If the court accepted First American's argument, all officers within the management structure of a corporation could be held liable for unpaid premiums, even in the absence of any control over the corporation's financial affairs.

18

law.[12] Carlisle Cashway, Inc. v. Johnson (In re Johnson), 691 F.2d 249, 254 (6th Cir. 1982). The Sixth Circuit has held that defalcation "'encompass[es] embezzlement and misappropriation by a fiduciary, as well as the failure to properly account for such funds.'" Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel), 565 F.3d 963, 970 (6th Cir. 2009) (quoting Commonwealth Land Title Co. v. Blaszak (In re Blaszak), 397 F.3d 386, 390 (6th Cir. 2005)). Although "some circuits have held that 'defalcation' might include 'innocent' or merely negligent conduct," the Sixth Circuit has rejected this concept of "defalcation per se." In re Patel, 565 F.3d at 970 (citing In re Johnson, 691 F.2d at 257) (additional citations omitted). Instead, the Sixth Circuit requires a showing that the debtor was "objectively reckless in failing to properly account for or allocate funds." Id. (citing In re Johnson, 691 F.2d at 257).

Conduct is generally considered "reckless" if "the actor knows, or has reason to know, . . . of facts which create a high degree of risk of . . . harm to another" and the actor "deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." Restatement (Second) of Torts § 500 cmt. a (1965); see also Prosser & Keeton on the Law of Torts § 34, at 213-14 (5th ed. 1984); Black's Law Dictionary (9th ed. 2009) (reckless conduct is "characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk"). Objective recklessness occurs when, although the actor herself does not

---

[12] Accordingly, although the Michigan Insurance Code states that "failure to turn over funds" held by an agent constitutes prima facie evidence of a breach of fiduciary responsibility, this is not dispositive on the issue of whether the Debtor committed a "defalcation" under § 523(a)(4). Cf. In re Patel, 565 F.3d at 971 (under Michigan Builders Trust Fund Act, "failure to pay subcontractors first [is] 'evidence of the intent to defraud'" but this language is not dispositive in nondischargeability cases).

19

realize or appreciate the risk of harm to another, a reasonable person in her position would do so. See Restatement (Second) of Torts § 500 cmt. a (1965); Farmer v. Brennan, 511 U.S. 825, 836, 114 S. Ct. 1970, 1978 (1994) (contrasting the civil law objective standard for recklessness with the criminal law subjective test and explaining that a "person is objectively reckless if she "acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that is should be known") (citations omitted). This type of recklessness must "be determined from an objective examination of the actions of the parties in a particular set of circumstances." Demjanjuk v. Petrovsky, 10 F.3d 338, 349 (6th Cir. 1993).

When applied to fiduciaries, this objective standard charges the fiduciary "with knowledge of the law" and does not require subjective bad faith or intent to violate a fiduciary duty. In re Johnson, 691 F.2d at 255. If money held in trust is used by a debtor for purposes other than those for which it was entrusted, the debtor has committed defalcation, "so long as the use was not the result of mere negligence or a mistake of fact." Id. at 257.

Applying these standards, the court determines that the Debtor's actions with regard to the premium payments were not objectively reckless. Without question, the evidence establishes that it was Peck, and not the Debtor, who caused and controlled Advantage Title's failure to remit the premiums.[13] In accordance with the reasonable and agreed upon

---

[13] Despite First American's arguments to the contrary, the wrongful acts of Peck and Advantage Title should not be imputed to the Debtor. The Sixth Circuit has previously held, in the context of a *partnership*, that "the fraud of one partner can be imputed to another partner who had no actual knowledge of it" for purposes of nondischargeability under § 523(a)(2)(A) if the fraud occurred in the course of the partners' business and if the innocent partner shared in the benefits of the fraud. Ledford v. BancBoston Mortgage

20

division of duties at Advantage Title, the Debtor received the premium payments and turned them over to Peck. The Debtor also provided Peck with reports of amounts owed to First American. It was Peck's responsibility to remit the payments. Because Peck misused the corporate credit cards for her own personal benefit,[14] Peck kept premiums that should have been remitted to First American.

Notwithstanding this established relationship, First American argues that the Debtor breached her fiduciary duties by failing to apprise herself of the corporation's general financial situation, and, more specifically, by failing to ensure that Peck was remitting the premiums to First American. As an officer of Advantage Title, the court agrees that the Debtor should have been more informed about the corporation's financial situation. But it cannot be said that her actions were objectively reckless. The delegation of responsibility for remitting the premiums to Peck was a legitimate division of corporate responsibilities

--------

Corp., 970 F.2d 1556, 1561 (6th Cir. 1992), cert. denied, 507 U.S. 916, 113 S. Ct. 1272 (1993). The holding in Ledford was based on principles of partnership and agency law, which generally provide that each partner acts as an agent of the partnership and is jointly liable for the partnership's debts. See Mich. Comp. Laws Ann. §§ 449.9(1); 449.15.

Advantage Title was a corporation, not a partnership, and the principles that support imposing vicarious liability on an innocent partner do not apply to corporate entities, officers and shareholders. Unlike partners, corporate officers, directors, and shareholders are shielded from personal liability for corporate torts unless they participated in the wrongful act or the corporate veil is pierced. See Porter Capital Corp. v. Campbell (In re Campbell), 2008 WL 4682785, at *5 (Bankr. E.D. Tenn. Oct. 21, 2008) (unpublished opinion) (citing Cash America Fin. Servs., Inc. v. Fox (In re Fox), 370 B.R. 104, 113 (Bankr. 6th Cir. 2007)). Imputing liability for a corporation's tortious conduct to an individual officer or director, or from one corporate shareholder to another, would violate general corporate law, and "would extend vicarious liability beyond the traditional agency/partnership relationship, an extension the courts thus far have refused to undertake." Id. The wrongful acts of one corporate officer should not be imputed to another.

[14] There is no evidence that the Debtor personally benefitted from Peck's misuse of the credit cards. To the contrary, the evidence is that both the Debtor and the corporation were harmed by Peck's defalcation of the premiums.

21

that did not create an unreasonable risk of harm to First American. This is particularly true given the evidence that Peck was First American's main contact at Advantage Title and First American could have readily seen that the reports submitted were lacking and that the amount of funds remitted was suspect. Further, under the specific circumstances, the Debtor did not know or have reason to suspect that her business co-owner and long-time friend was using corporate funds for her own personal benefit rather than remitting them to First American as required under the Agency Agreement. The Debtor may have been less than diligent in her role as officer, but she was not objectively reckless.

## VI.  CONCLUSION.

First American has failed to prove that the Debtor owes a nondischargeable debt for defalcation while acting in a fiduciary capacity. Any debt which might be owed by the Debtor to First American shall be subject to the chapter 13 discharge, or to the chapter 7 discharge, if the case is converted. A separate judgment shall be entered accordingly.

Dated this 18th day of September, 2012
at Grand Rapids, Michigan

Honorable James D. Gregg
Chief United States Bankruptcy Judge

22